IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE NO. 4:13-CR-18-HLM-WEJ |
| DEMOND WILSON, Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Demond Wilson's Motion to Suppress Evidence Seized Without a Warrant [16] and his Preliminary Motion to Suppress Statements [17]. On July 30, 2014, the Court conducted an evidentiary hearing [38] regarding these Motions, which has been transcribed [40] (hereafter "Tr."). The parties have also briefed the issues raised. (See Def.'s Br [42]; Gov't Resp. [43].) In that briefing, the Government represented that it will not use defendant's videotaped statement in its case-in-chief, but that if he takes the stand and testifies contrary to it, then it might be used for impeachment purposes. (Gov't Resp. 11.) Given that representation, the Court **DENIES AS MOOT** Defendant's Motion to Suppress Statements [17].

Defendant's Motion to Suppress Evidence initially challenged the stop of his vehicle on January 8, 2013, and the search of his residence and vehicle on January 16, 2013.  However, defendant does not now contest the search warrants executed for his residence and vehicle.  Nevertheless, defendant argues that the stop of his vehicle violated his Fourth Amendment rights.[1]  The Government responds that this vehicle stop was valid under Terry v. Ohio, 392 U.S. 1 (1968).  Because the officers here had reasonable suspicion to stop defendant's vehicle, the undersigned **REPORTS** that the stop was lawful and thus **RECOMMENDS** that Defendant's Motion to Suppress Evidence [16] be **DENIED**.

I.     **STATEMENT OF FACTS**

Someone committed a murder in the area of Morgan Valley Road and Second Street in Rockmart, Georgia, on January 8, 2013, at approximately 10:00 a.m.  (Tr. 6, 47-48.)  Police were called and began investigating immediately.  (Id.)  Sgt. Wayne Lloyd of the Polk County Police Department contacted FBI Special Agent

---

[1] Defendant writes that, if the Court deems the initial stop and detention valid, then he does not contend that police lacked probable cause to search his vehicle, given the odor of marijuana coming from it and the subsequent alert of the drug dog. (Def.'s Br. 7-8.)

Micah Childers, who responded to the scene as well. (Id. at 5-6.)[2] Agent Childers testified that when a crime has just occurred, it is very important to act quickly to find witnesses and run leads to ground. (Id. at 7.) He learned shortly after arrival on the scene that other law enforcement officers had spoken with two individuals who said they had witnessed the shooting. (Id. at 7, 29-30.) The witnesses had reported that they were driving in their car toward the crime scene when they saw a black male driving toward them in a red, boxy, two-or four-door sedan with tinted windows. (Id. at 8, 31, 48.) They saw another man walk across the street toward the red car as if he knew the individual in the car. They saw the man turn away to run as if frightened, and then fall into a ditch. (Id. at 7-8.) Agent Childers and Sgt. Lloyd were interested in identifying the individual driving the red car, and seeking information about his whereabouts that morning. (Id. at 12, 54.)

Agent Childers and Sgt. Lloyd, along with two police officers, went to interview the two witnesses at about noon or 1:00 p.m. to verify their stories. (Tr. 8, 30, 48.) They drove an unmarked white sedan and wore plain clothes. (Id. at 68-

---

[2] Agent Childers is the coordinator of the FBI Safe Streets Northwest Georgia Criminal Enterprise Task Force; in that role, he works with local law enforcement in gang-related activity and cases such as this involving a violent murder with a gun. (Tr. 4-6.)

3

69, 78-79.) After interviewing the witnesses, this group headed back to the scene of the murder to continue the investigation. (Id. at 9.) They received a tip that someone with information about the murder wanted to speak to police, so they went to a house on Dever Street where they believed this witness lived and pulled into its driveway. (Id.)

As they were exiting their vehicle, the agents/officers saw a boxy red sedan with tinted windows driven by a black male come around the street corner; the vehicle pulled into the driveway next door (to the officers' left) and immediately pulled back out, traveling away from them. (Tr. 9, 33-34, 51, 69-70, 78.) Agent Childers testified that the driver's actions in pulling in, apparently seeing the officers, and immediately leaving, were very suspicious, and that the car matched or was very similar to the description of the vehicle seen at the location of the murder by the two witnesses. (Id. at 9, 33-34.)[3] The incident was suspicious and significant enough for Agent Childers and Sgt. Lloyd to issue a BOLO ("be on the lookout") for the red car and ask officers to stop it if possible. (Id. at 9, 33, 34, 51-52.)

---

[3] During the day, police officers had canvassed the neighborhood to look for cars that fit the description of the boxy red sedan seen at the shooting, but did not find one. (Tr. 37, 79-80.) The officers would have stopped any car matching the description seen in the area. (Id. at 38-39, 79.) Agent Childers conceded that there is some tint in virtually every window of every car made today. (Id. at 38.)

Although Sgt. Lloyd testified that the officers were about eighty yards away from the red car when they saw it in the next driveway (Tr. 70), Agent Childers testified that they were only about twenty feet away from it (id. at 42). Regardless, they were close enough to see that it was a Cadillac.[4] (Id. at 34, 70.) Further, Government Exhibit 14, a map depicting the area of the shooting and the vehicle stop, shows how close together the houses are on Dever Street.[5]

Agent Childers, Sgt. Lloyd, and two other officers, having gone to the wrong address, left the house and went up the street on Dever. (Tr. 10.) As they were sitting in another driveway about 3:30 p.m., they saw the same red boxy Cadillac with tinted windows driving toward them on Dever Street. (Id. at 10, 35, 52.) This location is about a block away from where the murder occurred (Id. at 49-50; Gov't Ex. 14.) Agent Childers walked out into the street to stop the car. (Tr. 10, 33, 52-53, 72.)[6] The driver, later identified as defendant (id. at 10-11), stopped the car in the

---

[4] Government Exhibits 16 and 17 are pictures of defendant's vehicle, which appears to be a boxy, Cadillac sedan with tinted windows. (Tr. 11-12.)

[5] Agents later determined that the driveway the red car had pulled into serviced a house owned by defendant's father, Michael Wilson. (Tr. 51.)

[6] Agent Childers testified that he walked out in the street and stopped the vehicle because (1) it was a boxy red sedan with tinted windows driven by a black male; and (2) he witnessed what he considered erratic behavior by its driver earlier

5

middle of the street and rolled down the car's window, where the officers began a conversation with him. (Id. at 10-11, 44-45, 53.) Agent Childers told defendant that there had been a murder, that his vehicle matched the description of the vehicle used in the murder, and that the officers wanted to talk to him. (Id. at 10.) This 3:30 p.m. stop of defendant's car was approximately five hours after the murder. (Id. at 84.) Given this time lag, no officer had been in hot pursuit of a boxy red sedan with tinted windows. (Id.) There was no emergency reason to stop this vehicle other than to investigate a crime that occurred five hours earlier. (Id. at 83-84.)

The officers asked defendant for consent to search his vehicle. (Tr. 13, 39.) Defendant replied that they could search, but that whatever was in the trunk was not his. (Id. at 11, 14, 39.)[7] Sgt. Lloyd, an experienced police officer, smelled the odor of marijuana coming from the car. (Id. at 40, 53, 81-82.) They asked defendant if he would get out of the car and talk to them. (Id. at 11, 53.) Defendant was cooperative and voluntarily got out of the vehicle. (Id. at 11, 43-44, 53-54, 73). Traffic was backing up because the road was blocked by this police activity. (Id. at

---

that day when it pulled into and quickly backed out of the neighboring driveway. (Tr. 35.)

[7] The agents/officers testified that, given this "qualified" statement, they did not rely on defendant's consent to search his vehicle. (Tr. 14, 39-40, 58, 75-76.)

6

45, 53.) Sgt. Lloyd asked defendant for permission to move his car out of the middle of the road for safety reasons, which was granted. (Id. at 11, 45, 53, 73.) When Sgt. Lloyd got into defendant's car, he again smelled the odor of marijuana. (Id. at 54-55.)

After exiting his vehicle, defendant began talking to the officers. (Tr. 59.)[8] During these conversations, defendant was not under arrest and not physically detained. (Id. at 12-13, 54, 55-56, 59, 65.) None of the agents or officers ever pulled a gun on defendant, handcuffed him, or placed him in a police car. (Id. at 12-13, 59.) However, defendant's car had been stopped, and he would not have been allowed to leave until after officers talked to him. (Id. at 72-73.)

Because Sgt. Lloyd desired to investigate the marijuana smell, he called a K-9 police officer to the scene so that his dog could sniff for drugs. (Tr. 14, 41, 55, 58.) Within about fifteen minutes of the initial stop, Sgt. Zuker of the Cedartown Police

---

[8] A videotape from a police car captured much of this vehicle stop. (Tr. 15-18; Gov't Ex. 12.) The video lasts about thirty minutes, and the video (which lacks audio) shows defendant walking around and talking to the officers, both at his car and at a nearby patrol car. (Tr. 13.) Sgt. Lloyd testified that defendant made conflicting and suspicious statements regarding his whereabouts that morning. (Id. at 56-58.) For example, defendant initially claimed that the car belonged to his mother, that he had just borrowed it from her, and that he had not been anywhere that morning. It was later determined that defendant owned the car. (Id. at 13.)

7

arrived with his trained dog, Kai, which conducted a "free air sniff" and indicated that there were drugs in the car. (Id. at 55, 58, 83, 86-87, 102-104.) Officers searched the vehicle and found a .22 rifle in its trunk. (Id. at 25, 59, 63-64, 104.)[9]

## II. THE INDICTMENT

On April 9, 2013, the grand jury returned a two-count Indictment [9] against defendant. Count One alleges that, on or about January 8, 2013, in the Northern District of Georgia, defendant Wilson, having been convicted of a felony offense (i.e., a violation of the Georgia Controlled Substances Act on April 18, 2000, in case number 99CR129, in the Superior Court of Polk County, Georgia), which was a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate and foreign commerce, a firearm, that is, a .22 caliber rifle, in violation of 18 U.S.C. § 922(g).

Count Two alleges that, on or about January 16, 2013, in the Northern District of Georgia, defendant Wilson, having been convicted of the aforementioned felony offense, did knowingly possess in and affecting interstate and foreign commerce,

---

[9] Defendant claimed that the .22 rifle belonged to his father. (Tr. 64.) Officers gave the rifle to defendant's father at the scene of the search. (Id.) Defendant was not arrested at the scene of the vehicle stop for being a felon in possession of a firearm because officers were not able to verify his criminal record until later. (Id. at 65.)

8

rounds of ammunition, including .22 and .223 caliber ammunition, in violation of 18 U.S.C. § 922(g). The Indictment also contains a forfeiture provision.

## III. ANALYSIS

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002). Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, see United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975), the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot, see United States v. Sokolow, 490 U.S. 1, 7 (1989), or has already occurred, see United States v. Hensley, 469 U.S. 221, 229 (1985). See also United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) (police officer may stop and briefly detain an individual for investigative purposes if he has reasonable suspicion that the person was or is involved in criminal activity).

When discussing how reviewing courts should make reasonable suspicion determinations, the Supreme Court has repeatedly held that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has

9

a "particularized and objective basis" for suspecting legal wrongdoing. See, e.g., United States v. Cortez, 449 U.S. 411, 417-18 (1981) (also stating that reasonable suspicion deals not with "hard certainties, but with probabilities").[10] "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418); see also Ornelas v. United States, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, see Terry, 392 U.S. at 27, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. See Sokolow, 490 U.S. at 7. Indeed, the Supreme Court has "consistently recognized

---

[10] For example, in evaluating the totality of the circumstances, a court may consider:  (1) the passage of time between the crime and the investigatory stop because "the police can usually be expected to have had the time to develop a more specific description of the suspect," United States v. Hudson, 405 F.3d 425, 437 (6th Cir. 2005); (2) the "collective knowledge of [all of] the officers involved in the stop," United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989); and (3) "an individual's proximity to illegal activity" United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002).

10

that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" Navarette v. California, 134 S. Ct. 1683, 1691 (2014) (quoting Arvizu, 534 U.S. at 277).

Ultimately, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Hence a Terry stop requires only a "minimal level of objective justification," INS v. Delgado, 466 U.S. 210, 217 (1984), and an officer may initiate one "based not on certainty but on the need to 'check out' a reasonable suspicion." United States v. Clark, 24 F.3d 299, 303 (D.C. Cir. 1994). As stated in United States v. Abdus-Price, 518 F.3d 926 (D.C. Cir. 2008), reasonable suspicion is "not a particularly high bar." Id. at 929.

The parties agree that reasonable suspicion is the standard and cite many of the same cases. However, they disagree on whether the facts here support its existence. In the Court's view of the undisputed evidence, the totality of the circumstances support the officers' reasonable suspicion to stop defendant's vehicle and to briefly detain and question him, especially given the relatively low governing threshold.

11

The facts show that law enforcement received information from witnesses that a red, boxy sedan with tinted windows driven by a black male was likely involved in the shooting. Therefore, these agents/officers, all of whom were experienced in criminal investigations, were on the lookout for such a vehicle as they patrolled the area around the crime scene. Their suspicions were aroused when they were parked outside a residence on Dever Street and saw a car matching that description driven by a black male pull into the driveway of the adjoining house and suddenly back out and drive off the other way. The agents/officers collectively viewed this activity as suspicious; not only did they believe that the car (now identified as a Cadillac) matched the description given by the witnesses, but also they felt that the driver had seen them, recognized them as law enforcement, and quickly left to avoid speaking with them.[11] Thus, Sgt. Lloyd issued the BOLO. The agents/officers then drove

---

[11] Defendant argues correctly that there is nothing illegal about pulling quickly into and out of a driveway. He may only have been turning around. However, the agents/officers were justified in forming "[a] reasonable suspicion of criminal activity . . . by observing exclusively legal activity, even [though] such activity [would have been] seemingly innocuous to the ordinary citizen." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (internal quotation marks and citations omitted); see also Wilson v. Correa, No. 07-22343-CIV, 2009 WL 302247, at *3 (S.D. Fla. Jan. 20, 2009) (in § 1983 case, plaintiff Wilson's rough physical similarities with the BOLO description, combined with his apparently unusual movements, however innocuous, at a hotel very close to the most recent robbery provided the defendant officer with reasonable suspicion for the vehicle stop because

down Dever Street and in a short while saw the same red car driving toward them. Agent Childers stepped out into the road to stop defendant's vehicle, and he voluntarily complied.

Defendant argues that the description of the vehicle was too vague to support reasonable suspicion. However, most of the circuit courts decisions he cites affirm the denial of suppression motions because the vehicle stopped was, like here, similar to one described in a BOLO, and that "description narrowed the number of vehicles to provide reasonable suspicion for the traffic stop." United States v. McCall, 563 F. App'x 696, 701 (11th Cir. 2014) (per curiam); see also United States v. Webster, 314 F. App'x 226, 227 (11th Cir. 2008) (per curiam) (BOLO issued for dark-colored vehicle with "Down South Customs" on the rear window; car stopped one to one and one-half hours later was blue with "Down and Dirty Customs" on the rear window); Abdus-Price, 518 F.3d at 928 (BOLO for 1994-1997 Crown Vic Ford, tan on the side, black on top, with smoked out windows; car stopped forty minutes later two blocks from crime scene was Ford Crown Vic with dark tinted windows, dark blue in color, with white driver's side door); United States v. Johnson, 192 F. App'x 935, 938 (11th Cir. 2006) (per curiam) (BOLO issued for two black males in white

---

it appeared that Wilson was "casing the hotels").

Malibu; car stopped 1.7 miles from crime scene (but time lapse unknown) matched that description).

In the two circuit cases defendant cites where the seized evidence was suppressed, there were clear problems with reasonable suspicion that are not present here.  For example, in United States v. Rias, 524 F.2d 118 (5th Cir. 1975), police suspected two black males in a black or blue Chevrolet of a series of Farm Store robberies, although the most recent robbery occurred at least two weeks, and possibly a month, earlier.  Id. at 119.  An officer spotted two black males pass his position driving a black Chevrolet, and he knew there was a Farm Store in the area.  Id.  Thus, he eventually stopped their vehicle.  Id. at 120.  The Fifth Circuit found no reasonable suspicion and stated as follows:

> In the instant case, the facts known to the officer at the time he stopped the defendant clearly did not rise to the required level, and in reality were so tenuous as to provide virtually no grounds whatsoever for suspicion.  The officer was unsure whether the automobile used in the robberies was black or blue; the only description of the robbers was that they were black males; the last armed robbery of which he had any knowledge had occurred at least two weeks, and possibly a month, earlier; it was not unusual for blacks to be seen in the area; it was midday; the suspects made no attempt to flee.  In short, the officer simply stopped two black males because they were in a black Chevrolet.  This fact alone, without additional reliable evidence sufficient to warrant the conclusion that either or both of the men had

14

been or were involved in criminal activity, did not constitute cause to stop the vehicle.

Id. at 121.

Similarly, in United States v. Jaquez, 421 F.3d 338 (5th Cir. 2005) (per curiam), a BOLO issued that shots had been fired in a high-crime area of Abilene and that a "red vehicle" was involved; there was no information about its occupants. Id. at 340. Fifteen minutes later, an officer spotted a red car traveling away from that area and stopped it. Id. The Fifth Circuit "conclude[d] that the scant facts known to [the officer] when she stopped Jaquez were, as a matter of law, insufficient to support reasonable suspicion." Id. at 341. In so holding, the court explained that, although the officer knew that a red vehicle was involved, she did not know anything about the driver or the occupants. Id.

The facts of these two cases where officers lacked reasonable suspicion are different from the facts here. As noted above, the witnesses described seeing a black male driving a red, boxy, two-or four-door sedan with tinted windows at the crime scene. This is a much more detailed description than the red car described in Jaquez. During the time that elapsed between when officers obtained this description and the vehicle stop, the agents/officers saw a vehicle matching that description driven by

15

a black male pull into a driveway near them; they believed that the driver had noticed them, realized they were law enforcement, and left abruptly in the opposite direction to avoid them. This act, which the officers deemed suspicious in their experience, led to issuance of a BOLO. When the red, boxy sedan with tinted windows driven by a black male (more specifically identified by this time as a Cadillac) was spotted again–within close proximity to the crime scene and hours after the shooting–the agents/officers had a particularized and objective basis for suspecting legal wrongdoing. These facts are unlike those in Rias, where the crime occurred weeks before and the description of the car was vague.

In sum, the officers had reasonable suspicion to stop the vehicle here and question its driver–defendant. Accordingly, there is no basis to suppress the evidence found during the subsequent search of the vehicle.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES AS MOOT** Defendant's Motion to Suppress Statements [17]. The undersigned further **RECOMMENDS** that Defendant's Motion to Suppress Evidence [16] be **DENIED**.

**SO ORDERED AND RECOMMENDED**, this 6th day of January, 2015.


_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE